Filed 4/22/26  J.G. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| J.G. et al.,<br><br>          Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF SOLANO COUNTY,<br><br>          Respondent;<br><br>SOLANO COUNTY HEALTH AND SOCIAL SERVICES,<br><br>          Real Party in Interest. | A174819<br><br>(Solano County<br>Super. Ct. No. JD2300050) |

J.G. (Father) and O.R. (Mother) each filed a petition for extraordinary writ relief from orders issued at a 24-month review hearing (Welf. & Inst. Code, § 366.25)[1] terminating family reunification services and setting a permanency planning hearing (§ 366.26) as to their now three-year-old son, P.G.  Both parents argue that the juvenile court erred in (1) finding that the Solano County Health and Social Services Department (Department) offered them reasonable reunification services, and (2) denying their requests to continue services under section 352.  We deny the petitions on the merits.

---

[1]     Further undesignated statutory references are to the Welfare and Institutions Code.

# BACKGROUND[2]

## Petition, Detention, Jurisdiction, and Disposition

On August 21, 2023, the Department filed a petition alleging then eight-month old P.G. came within the meaning of section 300, subdivision (b) (failure to protect). It alleged that about a week earlier, Mother suffered a miscarriage while at home; demonstrated erratic behavior by placing the fetus on the floor and failing to seek immediate medical attention; and tested positive for methamphetamine while hospitalized for the miscarriage. In addition, Mother previously had tested positive for methamphetamine when she was pregnant with P.G. in October 2022, and at P.G.'s birth in December 2022. As to Father, the petition alleged he was aware Mother had tested positive for methamphetamine, but failed to take action and provide protective capacity within the home.

At the detention hearing on August 22, Mother was assisted by a Triqui interpreter, and Father a Spanish interpreter (as they would be at the hearings throughout this case). The court detained P.G. and placed him with a foster family. It granted the parents supervised visitation and ordered that both parents submit to alcohol and drug testing and that Mother additionally participate in mental health services.

On October 30, the Department filed its jurisdiction and disposition report, which described the family's background as follows. The parents were born in Oaxaca, Mexico, met and started dating there, and were not married. At some point, they emigrated together to the United States. The family lived together in Fairfield at the time of the petition. Mother reported that

---

[2]     We summarize the facts in the record in a light most favorable to the juvenile court's orders. (See *In re Shelley J.* (1998) 68 Cal.App.4th 322, 329, superseded by statute on other grounds as stated in *In re Christopher C.* (2010) 182 Cal.App.4th 73, 82–83.)

she could speak, read, and write in Triqui, her primary dialect, as well as in Spanish, though later she would state she could not read or write in Triqui. Father stated he spoke both Triqui and Spanish, but did not know how to read or write in either language.

The social worker who authored the report, Cecilia Lopez, spoke Spanish and interviewed the parents in Spanish. Regarding Mother's interview in Spanish, she initially reported she understood the interview. However, after that interview, she requested that another interview be conducted in Triqui. Ms. Lopez did so, and reported that the information provided in both interviews was the same.

Mother admitted she used methamphetamine while pregnant with P.G., but denied doing so after his birth and at the time of the interviews. This, however, was contradicted by her drug test results, which included a positive test for methamphetamine. When confronted with that result, Mother claimed it was inaccurate. Mother also missed six of nine tests, despite being advised that a missed test would be presumed to be a positive result.

Father denied knowing about Mother's substance use, as well as using illegal substances himself, but admitted to drinking alcohol. Father missed nine of his 10 scheduled drug tests.

The parents missed several visits with P.G. during the reporting period.

The Department recommended that the court sustain an amended petition, which among other changes from the initial petition alleged that Father had a history of substance use and was periodically unable to properly care, supervise, and protect P.G.

On December 7, the court held the jurisdiction and disposition hearing

at which both parents submitted on the amended petition. The court sustained the allegations therein, adjudged P.G. a dependent of the court, and ordered that the parents receive reunification services.

**Six-Month Review**

On May 15, 2024, the Department filed a six-month review report.

The report attached the parents' case plans, which were translated in both Triqui and Spanish. Father's case plan objectives required him to stay free from illegal drugs and comply with drug tests; eliminate alcohol dependency; and meet P.G.'s physical, emotional, medical, and educational needs. Mother's case plan had the same objectives, with the additional requirement that she participate in mental health treatment services.

The Department, verbally and in person, discussed with the parents their case plan requirements with the assistance of a Triqui interpreter. However, the interpreter noticed that Father appeared to be under the influence of alcohol, which Father denied. The Department asked the court to order Father to submit to a drug and alcohol test. Father did so and tested positive for methamphetamine and alcohol. Ms. Lopez thereafter discussed Father's case plan with him in Spanish. Ms. Lopez was aware that Father could not read or write, but Father told her that he could identify and dial phone numbers. Thus, Ms. Lopez gave Father a list of the phone numbers of his referrals for services and highlighted them for him.

Both parents' progress in their case plan objectives during the reporting period was minimal.

The Department offered the parents family preservation services (FPS). When the parents did not respond to the FPS social worker's attempts to contact them, their referrals to FPS were closed. The parents, however, received another referral to FPS.

The Department referred Mother to a Spanish-speaking therapist.

4

Mother did not respond to the therapist's multiple attempts to contact her. Mother eventually agreed to complete an intake appointment, but she did not show up for her appointments thereafter, and so the referral was closed.

The Department referred the parents to an in-person parenting class and offered to arrange Uber rides for them. While both attended one class, they missed the remaining classes and were thus dropped from the course. As to Father, the Department provided him with additional parenting education referrals, reviewed phone numbers with him, and contacted service providers to explain that Father could not read or write. The service providers indicated they could accommodate Father's needs and attempted to contact him; however, Father failed to follow through with the referrals.

As for drug testing, Mother missed tests and/or tested positive for alcohol and substances during the reporting period. Father continued to test positive for methamphetamine and alcohol.

The Department also referred the parents to Recover Substance Use Services (Recover), which could provide services in Spanish and Triqui. The parents did not return calls from staff at Recover. When Recover was able to reach them, the parents said they were not interested in treatment. The parents, however, later agreed to engage in Recover's services.

In late January, the Department learned that the parents had active Medi-Cal benefits. Father also reported the parents were unhoused. The Department gave Father information about local resources and food pantries available in Solano County. The Department also discussed with both parents the option for them to enter into a residential treatment program; that way, they could have all of their basic needs, including housing, met, in addition to receiving substance abuse treatment. Mother "expressed her dislike towards the information provided." And both Mother and Father said

5

they would not go unless they could go to the same facility together. The social workers explained that was not feasible, given that the programs were focused on individual treatment and usually offered female-only or male-only placements.

After declining to engage in services for months, Father began participating in the program at Recover in March. However, on March 29 Father testified positive for methamphetamine and alcohol. Despite this, Father denied using substances other than alcohol.

While Mother underwent the intake process at Recover, she did not engage in services there, despite the efforts of the Recover staff, the Department, and FPS to get her to do so. In April, the Department informed Mother that it would refer her again to Recover.

The parents did not consistently attend scheduled FPS meetings, and so their referral to FPS was again closed.

Finally, regarding visitation, the parents attended their visits with P.G. once per week for two hours. The parents were told that to increase their visitation, they should try to test regularly and have normal test results, to which they expressed understanding.

At the six-month review hearing on May 30, the court found the Department provided the parents with reasonable services and that returning P.G. to his parents created a substantial risk of detriment to him. However, at the Department's recommendation, the court continued reunification services and set the matter for a 12-month review hearing.

**12-Month Review**

Prior to the 12-month review hearing, the Department filed an interim review report on July 19 and a status review report on September 11. Both reports indicated that the parents had made minimal progress in their reunification services.

6

The Department extended FPS services for the parents, continued weekly meetings with them, and assigned JoAnn Mares, who spoke Spanish, as the primary social worker in the case.

Ms. Mares and the FPS social worker met with Mother, and they went over her case plan again. Mother reported that she could not read or write in Triqui, and could only read Spanish. Accordingly, the Department provided Mother with copies of the reports and case plan in Spanish.

The Department reconnected Mother with a Spanish-speaking therapist, who previously had worked with Mother. Mother failed to engage in those services and said she did not need mental health services.

In June, the Department had Mother placed on the waitlist of a residential treatment program at Cache Creek Lodge (Cache Creek). After initially refusing to, Mother entered the program on July 26. There, Mother received mental health services and met weekly with a therapist to address coping skills, triggers, and relapse prevention. However, Mother left that program on August 28, prior to successful completion. The Department, however, was able to have Mother placed back on the waitlist at Cache Creek in September.

From April through September, Mother missed 14 drug tests and tested positive five times for methamphetamine and alcohol. Mother continued to deny methamphetamine use.

Turning to Father, in April he participated in the program at Recover, completing three out of four sessions. But he stopped attending and was unresponsive to the program's outreach, so his referral was closed.

The Department also referred Father to Cache Creek, which had immediate availability for him. But Father again refused to enter an inpatient treatment program unless Mother could attend with him.

Eventually, on July 17, Father reported he was willing to participate in an inpatient program. Due to his extensive alcohol and methamphetamine use, as well as his diabetes, detox was recommended.

On August 16, Ms. Mares transported Father to a hospital for medical clearance and to ensure he received his prescribed medications, before taking him to a detox facility.

On August 26, Father completed detox. With assistance from the detox program, he contacted three inpatient programs. However, none had beds available or Spanish-speaking staff. Ms. Mares also contacted several inpatient programs on Father's behalf, including Southern Solano Alcohol Council (SSAC) Detox, Genesis House, House of Acts, and Pueblos Del Sol; unfortunately, none had beds available but indicated that Father could call to continue to check for availability. Ms. Mares further contacted Partnership, which agreed to assist Father with continuing to call inpatient programs and support him through the intake process.

Meanwhile, from April through September 2024, Father missed nine drug tests, tested positive 10 times for methamphetamine, and tested positive six times for alcohol.

The Department referred both parents to a six-week parenting class offered in Spanish and through Zoom. The class instructor explained to Father what to expect from the class and told him she would send him a text message with the link to the meeting on Zoom before every class. When Father reported difficulty logging on to a Zoom meeting for the class on April 18, the instructor offered to help him, but when she called him, Father did not answer or return the calls. Ms. Mares and the FPS social worker also met with both parents in person to show them how to log onto the parenting course. Mother was inattentive, focusing on playing with the toys in the

8

meeting room. Although Father began to look for the Zoom meeting link, he abruptly said he and Mother had to leave. At subsequent meeting with Father (Mother elected not to attend and to remain in the car), Ms. Mares and the FPS social worker again tried to show Father how to log onto Zoom. But the meeting was interrupted when Father answered phone calls from Mother, who said she was ready to leave. Father left. Father and Mother did not attend the parenting classes and were dropped from the course.

The parents attended most of their visits with P.G. during the reporting period. The parents were affectionate with him. However, during some visits, Mother became easily frustrated with P.G. She and Father would sometimes argue in front of P.G. Also, Father fell asleep for about 10 minutes during one visit.

The Department reported that P.G. was doing well in the home of his foster family, who was meeting his needs.

The Department determined that despite receiving 12 months of services, the parents failed to utilize the services offered to them. The Department thus recommended that the court terminate reunification services for both parents.

The contested 12-month review hearing was set to occur over the course of several days starting on October 24. After the court held the first two days of the hearing the Department changed its recommendation from terminating services to continuing services. The court adopted that recommendation and set the matter for an 18-month review hearing.

In an addendum report filed on November 8, the Department explained it had changed its recommendation due to recent challenges in connecting the parents to culturally appropriate services.

The Department contacted Cache Creek on behalf of Father, but the

program would not be able to accommodate Father's needs for assistance with reading and translation. The Department contacted another inpatient program, but it had no immediate availability. The Department then contacted Recover, which was able to accommodate Father's limitations. Referrals and follow-up instructions were provided to Father. The Department also sent Father the address and times of Narcotics Anonymous (NA) meetings held in Spanish. Similarly, the Department had Mother placed on the waitlist at Cache Creek, and referred her to NA meetings in the meantime.

The Department referred the parents to parenting classes in Spanish. It also referred them to therapeutic visitation services, which would coach them on appropriate parent-child interactions.

The Department asked the court to continue the matter for an 18-month review hearing so that it could continue working on finding appropriate services for the parents.

On November 14, the court filed its findings and orders for the 12-month review hearing. It found that reasonable services were provided and that there was a continued risk of detriment should the court return P.G. to the parents, but agreed to continue services and set the matter for an 18-month review hearing.

**18-Month Review**

In its 18-month review report filed on January 15, 2025, the Department indicated that the parents' progress in their case plan services remained minimal. The parents missed parenting classes. Mother missed eight drug tests, tested positive for methamphetamine on five occasions, amphetamine on one occasion, and alcohol on one occasion. Father missed 10 tests, tested twice for methamphetamine, once for alcohol, and once for a benzodiazepine.

10

Mother entered Cache Creek on December 20, 2024, but was discharged on January 13, 2025. The Department found another inpatient program for her at Genesis House, which reported it could offer services in Spanish. On January 14, Ms. Mares transported Mother to Genesis House.

The Department also referred Mother to a psychological evaluation, and she was placed on a waitlist for such an evaluation at UC Davis.

Father's Medi-Cal coverage was discontinued as of December 1, 2024, and so the Department could not secure a bed at any residential programs for him. The Department assisted Father in reapplying for Medi-Cal, which coverage would resume on January 1, 2025. In the meantime, the Department referred both Father and Mother to attend NA and Alcoholics Anonymous (AA) meetings and provided information of the meetings offered in Spanish.

The parents continued to attend visits with P.G., with the exception of some missed visits due to one or both of them not feeling well.

P.G. continued to do well with his foster family.

The Department determined that the parents had made minimal efforts to engage in their case plan and lacked insight into how their substance abuse placed P.G. at risk. Nonetheless, because the parents had started meeting more consistently with the Department and showed a desire to enter into a substance abuse program, it recommended that the parents be given an additional six months of services.

At the 18-month review hearing on February 21, the court found reasonable services were provided and there was a continued risk of detriment, but adopted the Department's recommendation to continue services and set the matter for a 24-month review.

**24-Month Review**

The court held the contested 24-month review hearing over the course of several days starting on September 4 and concluding on November 6.

***Status Review Reports***

The Department filed a status review report on August 25 and an addendum report on October 14. The court admitted these reports into evidence.

In the status review report, the Department recommended that the court terminate the parents' reunification services because despite receiving over 24 months of services, "the parents have demonstrated limited and inconsistent progress toward resolving the conditions that necessitated the Department's involvement."

In January, the Department tried to find inpatient programs for Father but could not. The Department began to look for programs for Father, as well as Mother, in San Francisco. The Department coordinated the transfer of the parents' Medi-Cal benefits from Solano County to San Francisco County. The transfer occurred on February 26.

Meanwhile, on February 3, the Ms. Mares drove Father to the Billie Holiday Transitional Housing Program (Billie Holiday) in San Francisco, where he remained until March 10. On that day, Ms. Mares drove Father to the inpatient program at Casa Quetzal in San Francisco, a program that she located after conferring with the Latino Commission and had Spanish-speaking staff. On April 4, Father's case plan manager there, Oscar Blancas, reported that Father was doing well, although still learning to follow the rules and adjusting.

On May 29, Mr. Blancas informed Ms. Mares that Father would be completing the program on June 9 and would have to leave the facility and enter into a sober living environment. Ms. Mares learned that the parents

12

could not be placed in a San Francisco-based program designed for families in reunification because this case was under Solano County jurisdiction. Although Ms. Mares considered seeking a transfer of the case to San Francisco, she noted that transfer likely would have taken several months. Given that, and the fact that the 24-month review hearing was approaching, Ms. Mares believed a transfer of the case was not feasible. Also, Father expressed a desire to return to Solano County.

Ms. Mares then contacted sober living environments in Solano County, but many of them lacked availability or Spanish-speaking staff. SSAC Detox in Vallejo agreed to accept Father, but advised that his Medi-Cal benefits needed to be transferred back to Solano County. To that end, Ms. Mares submitted an expedited request to transfer Father's and Mother's Medi-Cal insurance to Solano County. The transfer was approved but would take effect after 24 hours. In the meantime, Ms. Mares called shelters, but they had no availability or Spanish-speaking staff. As would be seen, Father had to wait one day between his departure from Casa Quetzal and his entrance into SSAC Detox, during which time he had to sleep at his former employer's residence.

When Father arrived at SSAC Detox on June 9, he was told that the residents were responsible for their own food and expenses. Father disputed this and became increasingly rude and aggressive, calling staff derogatory names. As a result, Father could not remain there. Ms. Mares was able to find another sober living facility, Hammock Homes in Vallejo, to which she drove Father the next day.

Regarding Mother, she underwent psychological evaluations in

13

January and February.[3] The psychologist recommended that Mother complete a residential treatment program with either Triqui- or Spanish-speaking staff, after which she enter into a sober living environment to work towards sustaining her recovery and increasing visitation with P.G.

Mother participated in the program at Genesis House, but was discharged on March 10, due to a lack of interpreter services. As noted above, the Department then worked on transferring the parents' Medi-Cal benefits to San Francisco, and while that transfer was pending, Mother was also placed at the Billie Holiday program in San Francisco, where she could obtain services in Spanish.

After the Medi-Cal transfer was completed, on March 24, Mother entered the 90-day residential treatment program as Casa Aviva Women's Recovery Home in San Francisco, which she completed on June 9.

As also noted above, Mother could not continue receiving services in San Francisco, so the Department had to seek a transfer of the parents' Medi-Cal benefits back to Solano.

It was difficult at first to find a suitable sober living environment for Mother, but the Department eventually had Mother placed at the sober living facility at SSAC Detox in Vallejo. While there, she missed several drug tests, and on July 10 tested positive for methamphetamine, amphetamine, and alcohol. Mother reported that for several days, she went out to work a job with Father.

Also on July 10, SSAC Detox reported that Father showed up at the

---

[3]     The psychologist's evaluation report was filed under seal in this court. However, the Department's review reports, the testimony and arguments at the 24-month review hearing, and the parents' petitions—none of which was sealed—freely refer to the evaluation. We may thus discuss the facts regarding the evaluation.

14

front yard, appeared intoxicated, and demanded food and water from Mother. He was instructed to test, and did test, the results of which were positive for methamphetamine and alcohol.

SSAC Detox reported Mother could no longer be at the facility. However, it agreed to accept Mother back, provided she cut off contact with Father. Ms. Mares transported Mother to SSAC Detox on July 17.

Following the incident at SSAC Detox, Father started participating in the outpatient treatment program at AK Bean. Father attended AK Bean from August 6 through August 20, and tested negative for substances while there.

Mother also began attending the outpatient program at AK Bean on July 28. Mother actively participated in the program four times per week.

Meanwhile, the Department referred both parents to Drug Dependency Court. While they attended some appointments, they missed others.

Mother completed a parenting class during the reporting period. The Department confirmed Father's registration in the parenting class, but Father did not verify his attendance or completion of the class as of the date of the report.

As for visitation, as of April 18, visits increased from two to four hours per week. On June 8, the parents' visits progressed from supervised to unsupervised. But when Mother and Father tested positive for substances on July 10 and 11, respectively, their visits reverted back to supervised. This adjustment was made to ensure P.G.'s safety, while the parents continued to address their substance abuse issues.

The Department reported that P.G. continued to thrive in his current placement. His foster parents were consistently meeting his developmental and emotional needs. P.G. was described as happy, active, and comfortable

15

in his environment.

The Department concluded its report stating, "Given the length of time the case has been open, the repeated relapses, and the lack of sustained behavioral change, [the social worker] has assessed that the parents have not made sufficient progress to ensure the child's safety in their care." The Department thus recommended terminating reunification services to the parents.

In its addendum report filed on October 14, the Department reported that on August 29, Mother tested positive for methamphetamine and was subsequently discharged from the SSAC sober living environment. On September 2, she entered a 90-day treatment program at Archway Recovery Services (Archway), which provided interpreter services. Mother disclosed that Father was "the one who purchase[d] the drugs."

On August 27, Father tested positive for methamphetamine. On August 29, staff at Hammock Homes reported Father was uncooperative and not responding to calls. That day, Father admitted he had relapsed. Staff recommended Father re-enter detox.

In September, the Department assigned a new social worker, Patricia Fletcher, who reached out to Father. Father repeatedly contacted social worker Fletcher, asserting he did not understand why his son was detained and denying having substance abuse issues prior to the child's removal.

On September 15, Father reported he had entered the House of Acts inpatient program, which provided random drug testing and Spanish interpretation services.

Father also continued to participate in the outpatient services at AK Bean. Staff at AK Bean reported that Father consistently attended sessions, "but appeared largely in the Pre-Contemplation stage of change." He

16

frequently struggled to accept personal responsibility, often attributing the removal of P.G. to the actions of others, rather than recognizing his role in the situation.

At a child and family (CFT) meeting on October 3, Mother's case manager at Archway reported that Mother remained in "Phase I" of the program and was prohibited from phone contact with Father until progressing to "Phase II." Also at the meeting, a representative of House of Acts reported Father was doing "fine" and had been testing negative since September 12. Father was also subject to 30-day "blackout" period of having no contact with Mother.

Regarding visitation, the parents continued to attend their weekly supervised visits with P.G. There were, however, concerns that during visits, the parents did not focus their attention on P.G. and displayed inappropriate behaviors. For example, they were overly physically affectionate with each other. Father in particular discussed the case in front of P.G. in an emotional manner or ranted about his life and struggles to the point he needed to be redirected. The Department thus determined that parental visits would be separated due to the inappropriate behavior during visits, as well as the fact that their respective treatment programs prohibited them from being in contact with each other.

### Witness Testimony

At the 24-month review hearing, the court heard testimony from Father, Mother, supervising social worker Jessica Weaver, and social worker Mares.

#### Father

Father testified that he last consumed alcohol on September 14, 2025, when he entered a rehabilitation program. He last used methamphetamine when he left the program in San Francisco but could not recall the exact date.

17

Father claimed he did not know his case plan services.  However, he testified that he knew that he had to test for substances and that his case plan required him to attend parenting classes.  Father also stated that he told social worker Mares "[e]very day" that he did not understand their communications in Spanish.

Father testified that after completing a 90-day treatment program in San Francisco, he stayed at a boss's residence before entering a sober living facility in Vallejo.

Father denied that he showed up intoxicated at Mother's sober living facility on July 10; he showed up only to ask her to bring him food.  However, he acknowledged testing positive for methamphetamine and alcohol the next day.

Father said that after that incident, he personally looked for another program and found the program at AK Bean on his own.  Someone at AK Bean then referred him to the inpatient program at House of Acts, where he was participating at the time of his testimony.  House of Acts provided a Spanish interpreter and included substance abuse classes and Alcoholics Anonymous meetings.  Father felt the program was supportive, while the programs that the Department had referred him to previously were not.

Father had been attending AA meetings for approximately two weeks.  When asked to identify the first step of AA, Father was unable to do so.  Father admitted he had drinking problem and stated that the Department did not assist him in finding a treatment program, which he located on his own.  He also claimed he did not have a drinking or drug problem "until the Department came into [his] life."

18

**Mother**

Mother admitted she tested positive for methamphetamine on August 30, 2025, and that the last time she consumed alcohol was in October 2025.

Mother testified that she spoke both Triqui and Spanish. She could read Spanish but not Triqui. Mother worked with social worker Mares from January through September 2025 and communicated with her in Spanish. Mother said she only understood some of the communications she had with Ms. Mares in Spanish. Mother also claimed that she requested a Triqui interpreter for all their meetings, "but they never wanted to help."

Mother also stated that Ms. Mares just showed her a copy of her case plan without discussing it with her. However, Mother later acknowledged that Ms. Mares did go over her case plan goals with her. Mother also testified that Ms. Mares explained to her that her case plan required her to submit to drug testing and participate in a substance abuse program and mental health services.

Mother testified the Department "never help[ed] [her] to get" into a mental health program. However, Mother acknowledged that she previously completed an inpatient program in San Francisco that offered her individual therapy in Spanish. Mother also testified that the program she was participating in at the time, Archway, provided her with therapy and psychiatric services, drug courses, and translation assistance, and that she found the therapy helpful in addressing her methamphetamine use.

Mother could not identify any triggers for her methamphetamine use and denied that Father was such a trigger.

19

### Supervising Social Worker Jessica Weaver

Jessica Weaver testified she was assigned as the Department's supervising social worker in the case in February 2025. All parties stipulated Weaver qualified as an expert in risk assessment.

Ms. Weaver was asked about the specific services the Department had offered to the parents, as well as the parents' progress in those services. Weaver's testimony was generally consistent with the information contained in the Department's reports.

Among other things, when asked how the Department addressed Father's literacy barrier, Ms. Weaver testified the Department provided information to him verbally through an interpreter or a Spanish-speaking social worker. The Department also communicated with Father through text messages, knowing that he was able to convert texts into voice messages using an application on his phone called "voice notes."

Ms. Weaver was aware that after the parents completed their respective residential treatment programs in San Francisco, Father spent one night at his former employer's residence before entering into a sober living facility in Solano County. The reason the Department could not find a sober living environment in San Francisco for the parents was due "the [parents'] residency status as being from Solano County and having their case [in Solano County]." Ms. Weaver confirmed that Ms. Mares submitted an emergency request for a transfer of the parents' Medi-Cal benefits from San Francisco to Solano in order for them to transition into a sober living facility in Solano.

Ms. Weaver confirmed the Department's recommendation was to terminate the parents' reunification services.

Mother was partially compliant with her mental health services. Mother completed a psychological evaluation, and the Department reviewed

20

and implemented the recommended services, which included substance abuse treatment, sober living, mental health services, and later couples counseling. The Department updated Mother's case plan in accordance with the psychologist's recommendation of services. Those services were similar to the ones that the Department had been offering to Mother, with the exception of couple's counseling.

When asked about the detriment of returning P.G. to Mother's custody, Ms. Weaver testified that while Mother was at the time approaching 60 days of being sober, she had "not demonstrated sustained sobriety or an ability and willingness to do so." Ms. Weaver explained that Mother "has been in treatment programs before, has completed one before and with aftercare supports [but] has still not be[en] able to maintain sobriety." This was so, despite the Department "providing support around this for two years with no sustained change."

For similar reasons, the Department's recommendation to terminate Father's services was because he "has not been able to demonstrate sustained progress in his sobriety and has relapsed at least twice in the last three months and is back at the beginning stages of his sobriety journey." Father also only partially complied with parenting classes.

Regarding the parents' visits with P.G., Ms. Weaver testified that throughout the reporting period, visits were weekly and supervised. In June 2025, the parents' visits progressed to unsupervised. Afterwards, however, the caregivers reported that P.G. exhibited signs of distress, including clinginess and crying. In July 2025, visits returned to supervised after both parents relapsed. P.G. no longer exhibited any distress following visits with the parents. Since July 2025, the Department had been unable to change the visits back to unsupervised due to parents' inability to maintain sobriety.

21

The Department also had concerns that the parents were overly physically affectionate with each other during visits and failed to engage appropriately with P.G. In October 2025, during a CFT meeting, the parents were informed that visits would be separated to allow each parent to focus on P.G., and also to ensure they complied with the rule from their residential programs to refrain from contact with each other. Despite these restrictions, Father reportedly contacted Mother's treatment program in September and October 2025.

### Social Worker JoAnn Mares

Ms. Mares testified she was assigned to the case as the primary social worker from July 2024 through August 2025. Ms. Mares also testified to the services that the Department provided to the parents in a manner consistent with the Department's reports.

Ms. Mares testified she communicated with both parents in Spanish, and that they responded to her in Spanish. Ms. Mares believed the parents understood their communications in Spanish because they communicated back and forth by asking each other questions and responding appropriately. During those conversations, Mother never asked Ms. Mares for a Triqui interpreter. Ms. Mares on her own, however, tried to find Triqui-language services through coworkers, Google, and 211 services, but was unable to. Also, she asked the specific treatment facilities whether they offered Spanish and Triqui assistance, but none offered Triqui assistance.

Ms. Mares explained that when speaking with Mother, she reviewed the case plan by showing her a Spanish-language copy and reading it aloud. To confirm Mother's understanding, Ms. Mares asked Mother to repeat the case plan and goals, which Mother did.

Ms. Mares also communicated with Father in Spanish and believed he understood her because he engaged in conversation. During their meetings,

Father never stated that he did not understand her Spanish or requested a Triqui interpreter. Ms. Mares knew Father could not read, so she read the case plan aloud to Father, and Father never reported that he did not understand his case plan services.

Ms. Mares also testified that she provided the parents with transportation assistance, including driving the parents to programs and visits, arranging Uber rides, and providing bus passes and gas cards. Ms. Mares also provided Father with the phone number for transit services that offered training on how to use the bus system and would support the Father by showing him the bus route. She left Father voicemail messages explaining his specific bus routes and transfers that would get him to his destination, along with the times to do so. Ms. Mares also met with Father at least once a month to help arrange transportation to programs or visits.

### *Arguments*

In closing argument, Father's counsel asked the court to find the Department failed to provide Father with reasonable services. Counsel argued that the "first program" that the Department referred Father to was the program in San Francisco in 2025. "So that's really where his services start is at that place." Counsel added, "If the Court is not willing to find a lack of reasonable services, then I'll request that the Court make a [section] 352 finding to allow this father . . . a real opportunity to reunify with his son. Because there are extraordinary circumstances with regard to culture. That has never been taken into consideration."

Mother's counsel argued that the Department did not provide reasonable services because it among other things failed to provide her with Triqui interpreters. Mother's counsel also asked the court to continue Mother's services pursuant to section 352.

Counsel for the Department argued that the parents received

23

reasonable services over the past "two years and two months." Counsel asserted that the parents had made "minimal progress in addressing" their substance abuse issues, "the main reason this case came in." The parents also failed to take accountability for their actions. Counsel added, "[D]espite two years and two months, these parents have not been sober or demonstrated they're sober." Counsel acknowledged that the court had authority to continue services pursuant to section 352. Counsel argued, however, that there were no "extraordinary circumstances outside these parents' control" that prevented them from completing their case plans, and that a continuance would be contrary to the best interests of P.G.

P.G.'s counsel agreed with the Department's counsel that reasonable services were provided to the parents throughout the course of the case. "And as for the [section] 352 argument," P.G.'s counsel argued that continuing services for another six months would be contrary to P.G.'s interest. Counsel added, "to put this minor through this over and over again in the hopes that the next six months will be better than the last is unfair to my client."

### *The Juvenile Court's Ruling*

Following that argument, the court announced its ruling. The court stated that the law required services to be reasonable under the circumstances, not perfect. And here, the court found that the Department met that standard. It observed that while the Department at times struggled with finding programs to address the parents' language barriers and father's illiteracy, it made good faith efforts to find such programs and, indeed, found some residential treatment programs in which the parents participated successfully. The court also explained that "[w]hile it would have been great to have a Triqui interpreter for the mother, mother herself testified that she speaks Spanish and that she reads Spanish." As for Father, "for the most part he has used a Spanish interpreter" throughout the case. The court

24

added that although "[w]e have been to court quite a bit of times," the parents never raised "the issues of no Triqui interpreter at a program" or "the services provided at the programs."

The court further observed that while the parents had completed some substance abuse treatment programs, they had relapsed on at least two occasions, even while having a support network and the benefit of residing in a sober living environment.

The court concluded it was not in P.G.'s best interest to continue services pursuant to section 352, terminated reunification services for both parents, and set a section 366.26 hearing for March 5, 2026.

Father filed a notice of intent to file a writ petition on November 6, 2025, and Mother on November 10, 2025. Each parent filed a petition for extraordinary writ, seeking review of the juvenile court's orders and requesting a stay of the March 5, 2026 section 366.26 hearing pending determination of the petitions. On February 11, 2026, we stayed the section 366.26 hearing pending further order of this court.

## DISCUSSION

### General Legal Background

When a child has been removed from a parent's custody at a disposition hearing, the juvenile court ordinarily must order child welfare services designed to facilitate the reunification of the family. (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 624 (*Michael G.*), citing §§ 361.5, subd. (a), 362, subds. (c), (d).) Such services " 'enable [parents] to demonstrate parental fitness and so regain custody of their dependent children.' " (*Michael G.*, *supra*, 14 Cal.5th at p. 624.)

Section 361.5, subdivision (a) sets forth various time limitations on reunification services. (*D.T. v. Superior Court* (2015) 241 Cal.App.4th 1017, 1034–1035.) "Eighteen months is generally considered the outer statutory

25

time limit for reunification services." (*In re Damian L.* (2023) 90 Cal.App.5th 357, 374.) "[T]o promote the prompt resolution of the child's custody status and her permanent and stable placement, the law sets a presumptive 18-month limit on reunification services. . . . If the child has already been out of the parent's custody for 18 months and still cannot be safely returned, the statute instructs that the court ordinarily must proceed to schedule a permanency planning hearing under section 366.26, at which the court decides whether to terminate parental rights and place the child for adoption or else select another permanent plan." (*Michael G., supra*, 14 Cal.5th at p. 627.)

Here, despite the court finding at the six-month, 12-month, and 18-month review hearings that the parents received reasonable reunification services, and that there was a continued risk of detriment to P.G. should he be returned to the parents, the court agreed to extend services for the parents at each hearing. Thus, the parents received reunification services for over 24 months following P.G.'s removal from their custody.

Section 366.25, which governs the 24-month review hearing, provides that if the child cannot be returned to the parents at that hearing, the court shall order a section 366.26 hearing. (§ 366.25, subd. (a)(3).) And although section 366.25, subdivision (a)(3) requires the court to make a reasonable services finding, it does not expressly condition setting a section 366.26 hearing upon that finding. Thus, section 366.25 imposes no express requirement that reunification services be extended beyond 24 months if the services offered or provided in the immediately preceding review period were not reasonable.

Instead, the authority for extending services beyond 24 months after removal lies in section 352. (See *In re D.N.* (2020) 56 Cal.App.5th 741, 762

(*D.N.*) [juvenile court has authority under section 352 to extend a parent's reunification services beyond 24 months].)  Section 352 provides that courts may "continue any hearing" under the dependency law "beyond the time limit within which the hearing is otherwise required to be held" (§ 352, subd. (a)(1)), provided there is "good cause" (*id*., subd. (a)(2)) and a continuance would not be "contrary to the interest of the minor" (*id*., subd. (a)(1)).

"California courts have found good cause in a number of cases where ' "extraordinary circumstances" ' justified an extension and doing so was consistent with the child's best interests.  [Citation.]  'Extraordinary circumstances exist when "inadequate services" are offered by the child welfare agency or "an external force over which [the parent has] no control" prevented the parent from completing a case plan.' "  (*Michael G., supra,* 14 Cal.5th at p. 632, citing *D.N., supra,* 56 Cal.App.5th at p. 762.)  Further, the statutory discretion to "continue any hearing" "includes the authority to extend reunification services in the meantime."  (*Michael G.*, at p. 633.)

**The Parties' Arguments**

The "argument" section of Father's petition contains two main headings:  (1) "The Department Failed to Offer Father Statutorily Required Reasonable Services" and (2) "[T]his Court Can Extend Services Under Section 352 due to Extenuating Circumstances."  Mother's petition closely resembles Father's petition, as it contains those same two headings, similar arguments as to the services provided to her, and citations to some of the same authorities.  Before we turn to these arguments, we make some initial observations about the petitions.

It appears that the parents essentially assert the same argument under two separate headings.  Under the second heading, both parents assert "[t]he second of the two different legal bases for extending reunification for parents . . . that apply in this case is section 352."  This implies that the

27

"first" legal basis for extending services in this case is, as asserted under the first heading of their petitions, that "The Department Failed to Offer Father Statutorily Required Reasonable Services." However, under that heading they concede that they are not statutorily entitled to an automatic extension of services at this juncture based on the lack of reasonable services, and that granting such an extension lies in the discretion of the juvenile court pursuant to section 352. Their petitions then segue into their argument under the second heading that they were entitled to a continuance under section 352. That argument in turn circles back to their first argument that they did not receive reasonable services. Thus, it appears that the parents raise the same argument under separate headings. We therefore address the parents' arguments as a single challenge, which is that the court erred in denying their requests for a continuance under section 352 based on a lack of reasonable services.

We also note that under the first heading of their petitions, the parents present a narrative of the case background, interwoven with some conclusory allegations, followed by subheadings of legal arguments that are also largely conclusory. Their arguments under the second heading, as noted above, reassert arguments regarding the adequacy of services, but in a slightly more developed manner. To the extent the parents raise conclusory arguments, we deem those arguments forfeited and do not consider them. (See *In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

Additionally, the parents challenge the services offered to them throughout the reunification period, not just the review period immediately preceding the 24-month review. However, the court made findings at the six-month, 12-month, and 18-month review hearings that reasonable services were provided. The parents could have, but did not, appeal those findings,

28

and so they are final and binding. (See *A.M. v. Superior Court* (2015) 237 Cal.App.4th 506, 512.) Thus, "our review [is] limited to th[e] period following the last reasonable services finding." (*Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, 675.) But even if we were to review the entire reunification period, for the reasons stated below we would find no error.

## The Juvenile Court Properly Terminated Reunification Services

### *Standard of Review*

" 'We review the juvenile court's decision to deny a continuance [under section 352] for abuse of discretion.' " (*D.N.*, *supra*, 56 Cal.App.5th at p. 756.) "However, '[t]he abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a [juvenile] court's ruling under review.' [Citation.] The [juvenile] court's factual findings are reviewed for substantial evidence; its conclusions of law are reviewed de novo; and its application of the law to the facts is reversible only if it is 'arbitrary and capricious' [citation] or ' " ' "patently absurd," ' " ' meaning that " ' " ' "no judge could reasonably have made the order" ' " ' in question." (*In re P.S.* (2024) 107 Cal.App.5th 541, 553.)

In applying the substantial evidence standard of review to the court's factual findings, we " 'must review the whole record in the light most favorable to the [order] below to determine whether it discloses . . . evidence which is reasonable, credible, and of solid value . . . .' " (*In re Angelia P.* (1981) 28 Cal.3d 908, 924, superseded by statute on other grounds as stated in *In re Cody W.* (1994) 31 Cal.App.4th 221, 229–230.)[4] "[A] reviewing court

---

[4]     The substantial evidence standard of review accounts for the standard of proof in the trial court. (See *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.) In contrast to the statutes governing prior review hearings, the statute governing the 24-month review hearing, section 366.26, does not specify the standard of proof for a reasonable services finding. (Compare

should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*In re Caden C.* (2021) 11 Cal.5th 614, 640.)

### *Reasonableness of Services*

Each parent asserts that the Department failed to provide reasonable services and that such "inadequate services" constituted "extenuating circumstances" to warrant continuing services past 24 months under section 352.

### **Applicable Law**

" 'The adequacy of the reunification plan and of the department's efforts to provide suitable services is judged according to the circumstances of the particular case.' " (*In re A.O.* (2025) 111 Cal.App.5th 1048, 1062.)

" 'Reunification services must be "designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300." ' " (*B.D. v. Superior Court* (2025) 110 Cal.App.5th 1132, 1151 (*B.D.*).) The Department is required to make " '[a] good faith effort' to provide

---

§ 366.25, subd. (a)(3) [at 24-month review, the court "shall determine whether reasonable services have been offered or provided"] with § 366.21, subd. (f)(1)(A) [at 12-month review, the court "shall . . . determine by clear and convincing evidence whether reasonable services . . . have been provided or offered"] and § 366.22, subd. (a)(3) [at 18-month review, the court "shall determine by clear and convincing evidence whether reasonable services have been offered or provided"].) Such silence indicates that the preponderance of the evidence standard should apply at that stage of the case. (See *Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 594 ["When a statute is silent on the standard of proof, the preponderance of the evidence standard ordinarily applies."].)

reasonable services." (*In re Monica C.* (1995) 31 Cal.App.4th 296, 306.)
" 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' [Citation.] Thus, while ' "services need not be perfect,' " they ' "should be tailored to the specific needs of the particular family." ' [Citation.] In this regard, ' "the record should show that the [Department] identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult." ' " (*B.D., supra,* 110 Cal.App.5th at p. 1151.)

"However, it is not the court's role to force a parent to participate in services. 'It is . . . well established that "[r]eunification services are voluntary, and cannot be forced on an unwilling or indifferent parent. [Citation.]" [Citations.]' " (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1233.)

The court's finding that reasonable services were provided is reviewed for substantial evidence. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971.)

### Father's Services

Father argues that the court erred in finding that the Department offered him reasonable services, because the evidence shows that the services were not adequately tailored to address his "illiteracy and language barriers." Initially, we note that in so arguing, Father cherry-picks facts favoring his position while ignoring the evidence supporting the juvenile court's decision. Under the substantial evidence standard of review, we presume " 'that the record contains evidence to sustain every finding of fact.' " (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 (*Foreman*).) Thus, Father is required " 'to demonstrate that there is *no* substantial evidence to support the challenged findings.' [Citations.] . . . Accordingly, . . . . '[he] [is] required to

31

set forth in [his] brief *all* the material evidence on the point and *not merely [his] own evidence*. Unless this is done the error is deemed to be waived.' " (*Ibid*.) Here, by failing to fairly summarize the evidence, Father forfeits his substantial evidence challenge. (*Ibid*.) Forfeiture aside, his claim fails on the merits.

### Case Plan

Father asserts that "he did not understand his case plan" and that "[t]he social worker could have given [him] a recording device with his case plan articulated," as well as "followed up more often, given that he was unable to read and write." Father's suggestion that the Department did not do enough to ensure he understood his case plan is belied by the record.

The Department was aware that Father spoke Triqui and Spanish, and could not read or write. The social workers and service providers reported they communicated with Father in Spanish without any issues. In fact, one Spanish interpreter said that Father "speaks Spanish very well." The social workers also verbally provided information to Father either with an interpreter or a Spanish-speaking social worker. They also communicated with Father through an application called voice notes, which translated text messages into voice messages that he in turn could play aloud. With respect to Father's case plan, before the Department finalized it, a social worker verbally discussed with Father what a case plan was and the services that would likely be included in his case plan—substance abuse testing, substance abuse treatment, and parenting classes. Father stated he was willing to participate in those services, thereby confirming his understanding of the proposed case plan. Once the case plan was filed with the court, the social worker again verbally went over the case plan with Father using a Triqui interpreter. Furthermore, throughout the reunification period, social

workers verbally reminded him what his case plan requirements were, as well as his progress in complying with them. Father did not request a "recording device with his case plan articulated" or otherwise assert that he did not understand it. In fact, Father expressed his understanding of his case plan on multiple occasions.

*Parenting Classes*

Father also contends that his "illiteracy and language barriers were not adequately addressed in his referral of online parenting." Father complains that he "was reliant on logging into a Zoom parenting class, where [he] is not computer literate, given that he cannot read or write." (Italics omitted.) He then notes that he struggled with logging onto Zoom for the class on April 18, 2024 and that he ended up not attending the parenting classes. Father's suggestion that the Department referred him to a parenting class that was not tailored to his illiteracy challenges is unsupported by the record.

The specific parenting class Father with which he takes issue is a six-week online parenting class that was offered to him in Spanish and set to begin on April 18, 2024. When Father reported he had difficulty logging onto Zoom for the class that day, the instructor of the class offered to help him, and Father agreed he would call the instructor on April 22 to coordinate a time to meet in person so that the instructor could help him. On April 22, the instructor called Father, as well as Mother, and left them voicemail messages when they did not pick up. Neither returned the instructor's calls. On that same day, social workers of both the Department and FPS met with Father in person in order to show him how to log onto Zoom. The FPS social worker began by asking Father to locate the Zoom link for the class that previously had been sent to him. Father started scrolling through his phone, but after about a minute, he said he needed to leave.

On May 8, 2024, the Department and FPS social workers again met with Father in person and tried to show him how to access the Zoom link on his phone. But throughout the meeting, Father received and answered phone calls, including from Mother, who at the time elected not to attend the meeting, sat outside in the car, and told Father she was ready to leave. Father left and thus ended the meeting. Father missed the online parenting classes and was thus dropped from the course.

*Substance Abuse Treatment*

Father also contends that he "did not receive adequate substance abuse services until February of 2025, when he finally entered a residential facility" that had "Spanish-speaking staff" and did not require any writing, which was "crucial given [his] illiteracy." This argument ignores the overwhelming evidence to the contrary, which the Department sets forth in detail in its brief.

During the six-month review period from December 2023 through May 2024, the Department referred Father to the Recover substance abuse program, which could provide interpretation in Triqui and Spanish. When Father met with the social workers of the Department and FPS, he acknowledged that he understood the referrals provided and knew he was responsible for following up. Because the Department was aware that Father could not read, staff reviewed referrals verbally, assisted him in making phone calls, and highlighted phone numbers, which Father stated he could identify and dial. Despite these accommodations, Father consistently denied having a substance abuse problem, even after testing positive for alcohol and methamphetamine. Between January and March 2024, when contacted by the substance abuse program, Recover, Father stated he was not interested.

The Department also referred Father to inpatient treatment, but he

34

refused. Father eventually agreed to begin outpatient services with Recover in late March 2024. He continued, however, to deny methamphetamine use despite a positive test on March 29, 2024.

To further support engagement, the Department extended FPS and assigned a primary Spanish-speaking social worker (Ms. Mares). Despite weekly contact, Father continued to blame the Department for the child's removal and failed to acknowledge the role of his substance abuse in placing the child at risk.

In April 2024, Father completed three of four sessions in the Recover program. His case manager at Recover reported that Father was able to log onto the computer and reach out when he was having difficulty logging on. However, Father stopped participation in May and June 2024 and became unresponsive to both program outreach and Department efforts.

After initially declining inpatient care, Father agreed in July 2024 to enter an inpatient program, contingent on completing detox. The social worker transported him to medical clearance and detox. Although Father completed one week of detox in September 2024, no bed was available at the inpatient program at that time.

From September through December 2024, the social worker continued contacting multiple inpatient and outpatient programs, including Pueblos de Sol, SSAC Detox, House of Acts, and Recover, with consideration of Father's literacy limitations and needing Spanish services. The Department also coordinated with Partnership to assist Father with intake calls to make sure there was someone to assist him in Spanish.

In the meantime, the Department provided Spanish-language information for AA and NA meetings, including dates, times, and locations, and left voicemail messages so Father could listen to the details and continue

35

support to remain sober.

In January 2025, the Department attempted to place Father at Center Point and Cache Creek Lodge residential programs, but Father was unable to remain due to lack of Spanish-speaking support. In February 2025, the Department located and transported Father to the Billie Holiday transitional housing center in San Francisco, which had Spanish-speaking staff.

Based on the above evidence, the court could reasonably find that the Department made reasonable efforts to place Father in an appropriate substance abuse treatment program before February 2025. Whenever the Department was told a program lacked availability or appropriate language or reading assistance, it continued to seek alternatives. As the court here found, the Department was required to, and did, make good faith efforts to provide suitable substance abuse programs for Father. Moreover, the delay in Father's participation in substance abuse treatment was largely attributed to Father's own denial of having substance abuse issues, indifference to or refusal of treatment, unresponsiveness to Department and program outreach, and lack of follow-through when he did agree to participate.

Father also asserts that after he completed a residential treatment program in June 2025, the Department "failed to find him a sober living environment" that he could enter into immediately afterwards due to its delay in searching for such a facility. While it is true that the Department could not find a sober living facility that Father could enter into right away after completing his residential treatment program in June 2025, the record shows that the Department made extensive efforts to do so, but was unable to due largely to circumstances beyond its control.

In March 2025, the Department referred Father to a residential treatment program at Casa Quetzal in San Francisco. Father participated in

36

the program and on May 29, his case manager at Casa Quetzal met with the social worker to discuss Father's progress and the next steps, during which the case manager informed the social worker that Father would be completing the program on June 9 and would have to leave.

As the social workers testified, however, the Department was informed that the parents could not receive services in San Francisco County because this case was under Solano County jurisdiction and the parents' residence was technically in Solano county. While the Department could have requested a transfer of the case to San Francisco, a transfer may have taken several months, and the then upcoming 24-month hearing was approaching soon. Thus, the Department determined that a transfer was not a feasible option and decided to look for services in Solano County, which is where Father said he wanted to return to anyway. On June 3, Ms. Mares contacted multiple sober living facilities, but only one facility, SSAC Detox in Vallejo, had Spanish-speaking staff and availability. And while it agreed to accept Father, it advised that Father needed to have his Medi-Cal insurance benefits to be transferred from San Francisco County to Solano County. To that end, Ms. Mares submitted an emergency request for an inter-county transfer of the parents' Medi-Cal benefits. That request was approved, but the transfer would not take effect until after 24 hours. Meanwhile, Ms. Mares also contacted housing shelters, but they did not have availability or Spanish-speaking staff. As a result, there was a one-day gap between Father's departure from the San Francisco residential program and Father's entrance into the sober living facility, during which time he slept over at a former employer's house.

While this was not ideal, as discussed above, reunification services need not be perfect and the standard is not whether the services provided

were the best that might be provided in an ideal world. (*B.D.*, *supra*, 110 Cal.App.5th at p. 1151.) To the extent there are obstacles to the provision of services, there must be some effort to overcome those obstacles. (See *In re Alvin R.*, *supra*, 108 Cal.App.4th at p. 973.) The record shows that the Department made extensive efforts to find an appropriate sober living facility for Father to enter into right after completing his residential treatment program. The court could reasonably find that the Department's inability to do so had more to do with circumstances beyond the Department's control than inaction on its part, namely the limitations on the parents' ability to receive services in San Francisco, the challenges regarding the parents' Medi-Cal benefits, and the availability of a facility with Spanish-speaking staff.

Father further asserts that he "research[ed] his own treatment centers and attend[ed] NA and AA meetings on his own, without any assistance from the social worker." He cites his testimony that he located the AK Bean program on his own. AK Bean provided outpatient substance abuse treatment services. Father enrolled in that program on August 6, 2025, attended sessions, and tested negative for substances and alcohol while in that program.

To Father's credit, he took initiative to address his substance abuse, found AK Bean on his own, and made progress in that program, including by testing negative for substances while there. However, these circumstances do not negate the ample evidence showing the Department's efforts to provide him with substance abuse treatment. Indeed, while participating in AK Bean's outpatient services in August 2025, Father was in a sober living facility called Hammock Homes, to which the Department had referred him.

*Transportation Assistance*

Father acknowledges that the Department offered him bus passes that he could use to travel to his services and visits with P.G. However, Father complains that offering him bus passes was "neither adequate nor reasonable" because he was "unable to read" and thus "unable to navigate the complicated metro system." However, he ignores evidence that the Department called the transit services that provide assistance with how to navigate bus routes, scheduled a call between them and Father so they could walk him through how to use the bus, and gave them Father's phone number. The Department also attempted to review the bus schedule with Father by leaving him a voicemail stating "where he needed to go to catch the bus, at what time he needed to leave his location in order to arrive there so that he could get the bus that would take him to the next bus." The Department then gave him numbers of the bus and the transfers that would get him to his visit. And as noted, Father "kn[ew] numbers."

And even if Father had difficulty navigating the public transit system, the Department offered him other forms of transportation, including Uber rides, rides from the social worker personally, and gas cards.

In sum, Father has failed to demonstrate there is no substantial evidence to support the court's finding that the Department provided him with reasonable services.

### Mother's Services

Mother argues that her "language issues were inadequately addressed" in the Department's referrals to parenting classes, substance abuse treatment, and mental health treatment. Like Father, Mother presents only the facts favorable to her position. Therefore, she has forfeited her claim that insufficient evidence supports the court's reasonable services finding. (See

39

*Foreman*, *supra*, 3 Cal.3d at p. 881.)  In any event, the claim fails on the merits.

*Parenting Classes*

As Father did, Mother argues that she "was reliant on logging into a Zoom parenting class, where Mother is not computer literate, given that she cannot read or write in English." (Italics omitted.) For the reasons discussed above, this argument is unavailing.  The evidence showed that the instructor of the class, the Department social worker, and the FPS social worker tried to assist the parents with logging onto the online parenting class, but they failed to take advantage of those opportunities.  Mother was inattentive and distracted during a meeting at which the social workers tried to show the parents how to log onto Zoom.  And although they scheduled a later meeting, Mother chose not to attend and instead sat outside in the car while Father attended.

*Substance Abuse Treatment*

Mother also contends she "did not receive adequate substance abuse services until March of 2025, when she finally entered a residential facility with Spanish-speaking staff."  This contention is contradicted by the record.

In November 2023, Mother was referred to Recover for outpatient substance abuse treatment, which provided services in both Spanish and Triqui.  But Mother was unresponsive to the attempts by Recover, the Department, and FPS to speak with her about substance abuse and/or other services or otherwise said she was not interested in services.  Mother was also referred to an inpatient program, which she declined.

Between April 2024 and January 2025, Mother continued to miss drug tests and test positive for methamphetamine and alcohol, while denying she had a methamphetamine problem.

After refusing inpatient services for months, Mother participated in the Cache Creek inpatient treatment from July 26 through August 8, 2024, but left the program early. The Department contacted Cache Creek to see if Mother could return there to complete the program, and Cache Creek agreed to put Mother on its waitlist. Meanwhile, the Department referred Mother to NA and AA meetings. Mother was able to return to Cache Creek in December 2024, but was discharged after testing positive for substances.

In January 2025, the Department found and transported Mother to the Genesis House inpatient program, where the social worker assisted her in completing Spanish-language paperwork and confirmed the program had a Spanish interpreter. Apparently, however, the Spanish interpreter left Genesis House sometime after.

On March 10, 2025, the Department referred Mother to temporarily receive services at the Billie Holiday treatment center while her Medi-Cal benefits were pending transfer to San Francisco. Afterwards, the Department had Mother placed in a 90-day inpatient program at CASA Aviva Women's Recovery Home, which had Spanish-speaking staff and included weekly individual therapy. She completed that program in June 2025, and thereafter the Department arranged for her placement in sober living at SSAC Detox in Solano County.

Contrary to Mother's assertion, the above supplies substantial evidence that prior to March 2025, the Department made reasonable efforts to find a substance abuse treatment program with Spanish assistance for Mother, but that she failed to avail herself of those opportunities and continued to use substances.

*Mental Health Services*

Mother also asserts that "there were programs that offered mental health services but the Department was never able to follow up to confirm if those services were tailored to [her] needs." The record shows otherwise, as outlined by the Department.

The Department referred Mother to a Spanish-speaking therapist early in the case but Mother failed to follow through and cancelled appointments. When she eventually met with the therapist, Mother reported she did not believe she needed therapy. The Department nonetheless continued to meet with Mother to assist her in being connected to mental health services, but she remained unresponsive.

The Department referred Mother to an inpatient treatment program in July 2024, which allowed her to meet weekly with a therapist. But she left that program before successful completion. As noted, the Department contacted the program facility Mother could return there to complete the program, and the facility agreed. But when she returned to the program in late December 2024, she was discharged weeks later, after testing positive for alcohol and substances.

While Mother was participating in that program, the Department referred her to a psychological evaluation. Mother completed a psychological evaluation on January 27 and February 3, 2025, which recommended substance abuse treatment, sober living, and therapy. Ms. Weaver testified that these recommendations mirrored Mother's existing case plan services.

The Department then arranged for Mother to enter into a residential treatment program in San Francisco, where she received weekly therapy. Upon returning to Solano County, the social worker assisted her in contacting the mental health access line and enrolling in services. Mother

testified her therapy was conducted in Spanish and that she found it helpful.

In sum, Mother fails to establish there was no substantial evidence to support the court's finding that the Department provided reasonable services.

Consequently, neither parent establishes there were "extraordinary circumstances" that justified continuing services pursuant to section 352.

### *Whether a Continuance Was In P.G.'s Best Interest*

Section 352 also required the juvenile court to consider whether a continuance would be "contrary to the interest of the minor." (§ 352, subd. (a).) The court here found that granting the parents' request for a continuance would be contrary to P.G.'s best interest. This finding is both reasonable and supported by the record.

In asserting otherwise, both parents point to evidence that they had positive visits with P.G., that their visits progressed from supervised to unsupervised, and that the visits reverted back to unsupervised, going on to assert that the only reason for that was due to their respective substance abuse issues, not their parenting. The parents then acknowledge that they were "unable to remain sober, relapsed," but argue that they "immediately sought substance abuse services again on [their] own accord" and that their "continual work in [their] substance abuse treatment program will benefit the minor as well."

But as the court found, the parents' inability to stay sober, despite receiving many opportunities and support to address their substance abuse issues for over two years, is precisely the point. Although the parents started making progress in their respective programs as of the time of the 24-month review hearing, they were still in the beginning stages of recovery. Mother denied that Father was a trigger of her methamphetamine use even though she had admitted that he had supplied her with the drug. Father still failed to take accountability for his actions and attributed the removal of P.G. to

43

others. Considering the parents' actions throughout the case, the court could reasonably find that further services were unlikely to be successful. (See *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1505 ["It defies common sense to continue reunification efforts for a parent who has made minimal efforts throughout a case."]; see also *Michael G., supra,* 14 Cal.5th 609, 636 ["Where the available evidence reliably demonstrates that further reunification services would be unlikely to succeed, due process does not require that a court delay permanency for the child."].)

Additionally, in considering whether a continuance would be contrary to P.G.'s interests, the court was required to give "substantial weight to [P.G.'s] need for prompt resolution of his . . . custody status, the need to provide [him] with stable environments, and the damage to [him] of prolonged temporary placements." (§ 352, subd. (a).) By the time the 24-month review hearing commenced, P.G. had been with his foster family for over two years, where he had been thriving. In contrast, P.G.'s visits with parents were not stable. While the parents did have positive visits with P.G., there was evidence that visits were also negative. P.G. experienced distress around the time that the parents' visits progressed from supervised to unsupervised. And when visits reverted back to supervised, P.G. no longer exhibited distress.

For all of the above reasons, the court reasonably found that continuing services would be contrary to P.G.'s best interest.

In sum and in short, we conclude the court did not err in terminating the parents' reunification services and setting a section 366.26 hearing.

## DISPOSITION

The petitions for extraordinary writ are denied on the merits.  Our stay of the section 366.26 hearing is dissolved.  Our decision is final as to this court immediately.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)

_____

RICHMAN, J.

We concur.

_____

STEWART,  P. J.

_____

MILLER, J.

(A174819N)